25 So.2d 229

CRICHTON et al. v. LEE et al.

No. 37988.

Jan. 7, 1946.

Rehearing Denied Feb. 11, 1946.

R. D. Watkins, of Minden, for plaintiffs and appellants.

Dixon Carroll, J. P. D'Artois, John M. Madison, John B. Files, Ralph Goff, and R. L. Benoit, all of Shreveport, amici curiae.

David W. Thomas, Curator ad Hoc, of Minden (Blanchard, Goldstein, Walker & O'Quin, of Shreveport, of counsel), for Roy Lee, trustee, defendant and appellee.

Hussey & Smith, of Shreveport, for F. H. Brown and Bert Kouns, defendants-appellees.

HAWTHORNE, Justice.

This is a suit to annul and cancel an oil, gas, and mineral lease on the ground that the five-year primary term of said lease had terminated, and that the lease was no longer in effect because no well had been drilled on the leased premises, nor had any oil or gas been produced therefrom.

The lease was executed on January 23, 1937, for a primary term of five years and covers 40 acres described as the NW¼ of the SE¼ of Section 19, Township 21 North, Range 9 West, in Webster Parish, Louisiana.

The plaintiffs, Thomas Crichton, Jr., Mrs. Kate Jackson Crichton, Mrs. Kate Crichton Gredler, and Powell Crichton, are the owners of an undivided one-half interest in and to the minerals underlying the property covered by the lease, the remaining one-half interest being owned by A. D. Turner, Frank B. Treat, Gilbert S. Johnson, Jr., and P. F. Childs.

On the date of the lease, that is, January 23, 1937, Thomas Crichton, Jr., Trustee, and P. F. Childs, the then owners of an undi-

vided one-half interest each in and to the minerals underlying the property, executed an oil, gas, and mineral lease in favor of Bert Kouns. Kouns assigned to F. H. Brown an undivided one-half interest in this lease on February 15, 1937. Kouns and Brown on July 26, 1939, assigned the lease to Hassie Hunt, reserving an overriding royalty. Hunt in turn assigned all of his interest in and to said lease to Roy Lee, Trustee, on November 30, 1941.

. The defendants are F. H. Brown, Bert Kouns, and Roy Lee, Trustee, a non-resident represented by David W. Thomas, curator ad hoc. P. F. Childs and his vendees, the owners of the other undivided one-half interest in and to the minerals in the property, did not join plaintiffs in the suit to cancel this lease, but were made defendants herein in order to have all parties in interest before the court.

Defendants excepted to plaintiffs' petition on the ground that it set forth no cause or right of action, and filed also exceptions of non-joinder, which exceptions were overruled by the lower court. The case was submitted on an agreed statement of facts, and the trial judge rendered judgment in favor of defendants, rejecting plaintiffs' demands and fixing the fee of David W. Thomas, curator ad hoc for Roy Lee, Trustee, in the sum of $250 and taxing it as costs. From this judgment plaintiffs have appealed to this court.

The agreed statement of facts, which sets forth the execution of the lease and the assignments thereof to the various parties named hereinabove, and the exhibits mentioned therein, shows the following facts:

(1) No wells were drilled within the primary term of the lease on the NW¼ of the SE¼, Section 19, Township 21 North, Range 9 West, Webster Parish, Louisiana, the land covered by the lease, and plaintiffs made written demand for release or cancellation of said lease insofar as it affects the mineral interest owned by them, which demand was not complied with.

(2) Prior to July 2, 1940, all parties interested in production, except the plaintiffs herein, ratified the Cotton Valley Unitization and Pressure Maintenance Agreement, and thereafter, on January 28, 1941, the Commissioner of Conservation issued Order No. 10–C, wherein the "D" sand pool and the Bodcaw sand pool in the Cotton Valley Field, which included the property covered by the lease sought to be cancelled, were pooled and unitized for the purpose of recycling of gas and extraction of liquid hydrocarbons. On February 1, 1941, the date on which this order became effective, there were many producing wells upon the lands included in the order, which were then producing in paying quantities and have ever since been producing in paying quantities.

(3) In Order No. 10–C, the Cotton Valley Operators Committee was designated as the operator of said unitized and pooled area. This committee, at an expense in excess of $3,000,000, constructed a repressuring system and plant for the extraction of liquid hydrocarbons from the gas produced from the Cotton Valley unit. This system and plant were placed in operation on July 15, 1941, and, since said plant was placed in operation, the royalties of all parties in said unit, including those upon whose lands

wells were producing prior to the execution of the Cotton Valley Unitization and Pressure Maintenance Agreement and the issuance of Order No. 10–C, have been increased. Plaintiffs have been tendered their proportionate part of royalties from the Cotton Valley unit under the provisions of Order No. 10–C since the effective date of that order, that is, February 1, 1941, but have refused to accept royalty payment.

Order No. 10–C was issued by the Commissioner of Conservation under the authority of Act 157 of 1940, after publication of notice of a hearing and after said hearing, and became effective at 7:00 a.m. on February 1, 1941. This order, filed in evidence, after defining the "D" sand area and the Bodcaw sand area in the Cotton Valley Field, in which plaintiffs land is located, provides in Section 2:

"That in order to prevent waste, to avoid the drilling of unnecessary wells, to reasonably maintain reservoir energy and to obtain the greatest ultimate recovery, it is advisable, expedient and necessary that there be a unit plan of operation for development and production purposes, and accordingly, *said areas shall be treated as one lease, one property and one tract, and all oil, gas and other hydrocarbons within said areas, as the same may now be fixed or subsequently enlarged, are as to each of said areas hereby unitized, and the lands, royalties and lease interests containing same are hereby pooled and communized;* and, after the separation or extraction of liquid hydrocarbons, all gas produced therefrom in excess of the market demand shall be returned to the formations from which pro-

duced, less that amount thereof as is utilized or unavoidably lost in recycling operations, and the extraction of distillate, gasoline or other liquid hydrocarbons; the Cotton Valley Operators Committee, as established by that certain agreement executed by The Ohio Oil Company et al, as Operators, with and to E. L. Stewart et al, as Royalty Owners, and filed under Register No. 75063, Conveyance Records of Webster Parish, Louisiana, being hereby designated as the Operator of said unitized and pooled areas." (Italics ours.)

The lease in question was executed on January 23, 1937, for a primary term of five years, which primary term expired on January 23, 1942, and the clause therein on which plaintiffs rely for cancellation thereof reads as follows:

"Subject to the other provisions herein contained, this lease shall be for a term of Five years from this date (called 'primary term') and as long thereafter as oil, gas or other mineral is produced from said land hereunder."

Plaintiffs are demanding the cancellation of the lease on the ground that the primary term has expired and there has been no drilling or production on the leased premises. Defendants, on the other hand, contend that plaintiffs' land is a part of the unitized area, and that, under the unitization agreement and Order No. 10–C, which pooled and unitized plaintiffs' land with other lands in the field, the lease executed by Thomas Crichton, Jr., Trustee, and P. F. Childs has been maintained and continued in effect by oil and gas production in the

unitized area, notwithstanding the expiration of the primary term of the lease; in other words, that there has been production since February 1, 1941, the effective date of Order No. 10-C, from plaintiffs' property even though there was no well actually drilled upon this 40-acre tract.

In the lower court plaintiffs filed a special plea of unconstitutionality in which they pleaded the unconstitutionality of Act 157 of 1940 and the said Order No. 10-C insofar as they might be deemed to affect the rights of plaintiffs as lessors under said oil, gas, and mineral lease, the primary term of which had expired, and urged especially that the act and order take their property without due process of law, in violation of the Constitution of the United States, Amendment 14, and the Constitution of Louisiana, Article I, Section 2, and, further, impair their contractual rights, in violation of the Constitution of the United States, Article I, Section 10, and the Constitution of Louisiana, Article IV, Section 15.

Plaintiffs, in brief filed in this court, say that the constitutionality of Act 157 of 1940 is not attacked, and admit the validity thereof, as has been previously judicially determined, and say further that the proposition of law is well settled that a state has a constitutional power to regulate production of oil and gas in order to prevent waste and to secure equitable apportionment among landowners of the migratory gas and oil underlying their lands, fairly distributing among them the cost of production and of the apportionment. They contend, however, that this is not an issue in this case, and that the sole question presented is whether or not, from the facts of this case, the right of contract has been impaired and the property rights of plaintiffs illegally divested and taken from them.

Plaintiffs contend that the rights of the parties must be determined as of the date of the lease, and that the lease, being for a term of five years without production, lapsed according to its own terms on January 23, 1942. In support of this contention, they cite the cases of Cooke v. Gulf Refining Co. of Louisiana, 127 La. 592, 53 So. 874, and Parten v. Webb, 197 La. 197, 1 So. 2d 76. We have read these cases, and neither is in point with reference to the issues here involved.

We concede that, under the facts in this case, the lease would have lapsed at the end of the primary term in the absence of Order No. 10-C, which became effective on February 1, 1941, prior to the expiration of the primary term of the lease. As we appreciate it, plaintiffs' contention is that it would constitute a denial of due process of law and impair contractual rights, in violation of the State and Federal Constitutions, to apply Act 157 of 1940 and Order No. 10-C under the facts of this case, because the act was passed by the Legislature and the order issued by the Commissioner subsequent to the execution of the lease contract; or, to state it differently, that an exercise by the State of its police power for conservation of oil and gas constitutes denial of due process of law if the obligations of a previously executed contract are impaired.

The leading case decided by this court is that of Hunter Co., Inc., et al. v. McHugh,

202 La. 97, 11 So.2d 495, 502. Plaintiff in that case, the Hunter Company, drilled a well on a 190-acre lease owned by it in the Logansport Field, the well being completed on June 1, 1938, at a cost of approximately $44,000. Thereafter the company constructed its own pipe line, which cost the sum of $12,380.16, to a line owned by the United Gas Pipe Line Company and commenced delivering gas to that company on December 12, 1940. After the completion of the well, the Commissioner of Conservation on October 16, 1941, under the provisions of Act 157 of 1940, Sections 8(b) and 9(a), issued Order No. 28–B to regulate the production of gas from what is called the Jeter zone in the Logansport Gas Field in De Soto Parish and to provide for drilling units therein of 320 acres.

The Hunter Company contended that it should be permitted to produce from its well on the 190-acre lease the allowable measured according to the provisions of Act 252 of 1924, and that, so far as Order No. 28–B required the company to pool or unitize its 190-acre lease with sufficient acreage to conform with the 320-acre drilling unit, the order was unconstitutional. The lower court held Sections 8(b) and 9(a) of the act to be unconstitutional. In our opinion in that case, we said that one of the reasons for the trial judge's ruling was that "these provisions which purport to authorize the Commissioner of Conservation to compel the pooling of the interests of two or more landowners or leaseholders into a drilling unit are an attempt to authorize him to deprive a landowner or leaseholder

of his property without due process of law, or to deny him the equal protection of the law, in violation of the Fourteenth Amendment of the Constitution of the United States".

This court, in a well written and well reasoned opinion, reversed the judgment of the lower court and held that Act 157 of 1940 and Order No. 28–B, issued under the provisions of that act, were not unconstitutional for any of the reasons advanced by the plaintiffs in that case or maintained by the judge of the district court.

In Alston v. Southern Production Co., Inc., et al., 207 La. 370, 21 So.2d 383, 386, the question was whether an order of the Department of Conservation increasing the size of drilling units theretofore prescribed by the Department in the Logansport Gas Field could have the effect of superseding pooling agreements made by the owners of adjacent lands under the authority of a previous order of the Commissioner.

In that case, plaintiffs pooled their lands pursuant to an order of the Commissioner establishing drilling units of 320 acres and received royalties on this basis. Thereafter, subsequent to these pooling agreements, the Commissioner increased the size of the drilling units in said field. One tract of plaintiffs' land was pooled in a drilling unit of 610 acres and the other in a unit of 640 acres. Plaintiffs were tendered royalties accruing to them, in accordance with the orders of the Commissioner, on the basis of 610 acres to one of the units and 640 acres to the other unit. They refused to accept these royalty payments, claiming that

the royalties should have been paid on the basis of 320 acres to the unit, notwithstanding the order of the Commissioner increasing the size of the drilling units, for the reason that the pooling agreements provided for production units of 320 acres. They instituted suit for the cancellation of certain lease and the pooling agreements and for royalties.

Defendants admitted that, subsequent to the order increasing the size of the drilling units, they had not paid royalties in accordance with the pooling agreements and the previous order of the Commissioner establishing drilling units of 320 acres, but averred that they had tendered to plaintiffs royalties in accordance with the order of the Commissioner increasing the size of said drilling units, which order superseded the previous order and abrogated the pooling agreements.

This court refused to cancel the leases in question and rejected all demands of the plaintiffs. In the course of our opinion we said:

"An order of the Department of Conservation increasing the size of the drilling units theretofore established by an order of the department, in a given oil or gas field, may supersede contracts made between landowners or leaseholders in the oil or gas field under authority of the previous order of the department, without being subject to the objection that the later order is unconstitutional for impairing the obligations of such contracts. Hunter Co. v. McHugh, 202 La. 97, 11 So.2d 495; Id., 320 U.S. 222, 64 S.Ct. 19, 88 L.Ed. 5. See also Hood v.

Southern Production Co., 206 La. 642, 19 So.2d 336; Placid Oil Co. v. North Central Texas Oil Co., 206 La. 693, 19 So.2d 616; Hardy v. Union Producing Co., 207 La. 137, 20 So.2d 734."

The facts in Hardy et al. v. Union Producing Co. et al., decided by this court on December 11, 1944, and reported in 207 La. 137, 20 So.2d 734, 735, are very similar to the facts in the case here under consideration. In that case, as here, plaintiffs brought suit to annul an oil and gas lease, predicating their cause of action on the failure of the lessee to drill a well on the leased premises within the primary term of the lease. The lease was executed on September 9, 1938, for a term of five years and covered a tract of land containing approximately 47 acres in the Logansport Field in De Soto Parish, Louisiana.

Subsequent to the date of the lease but prior to the termination of its primary term, the Commissioner of Conservation, pursuant to the authority of Act 157 of 1940, issued Order No. 28–C, dividing the Jeter zone of the Logansport Field into drilling and production units of approximately 640 acres, with only one well allowed to produce on a drilling unit, and providing for the pooling of separately owned tracts of land and allocation of production of all tracts embraced within the drilling unit in the proportion that the area of each tract bore to the entire area of the unit. This order also provided that to any well producing gas from the Jeter zone there should be allocated the acreage comprising the drilling and production unit on which said well was located, and, so long as there was any well

on any of such drilling and production units capable of producing gas in paying quantities, no further or additional wells should be drilled on any such unit.

Plaintiffs' 47-acre tract was pooled, unitized, and consolidated for the production of gas from the Jeter zone of the Logansport Field by Order No. 28–C–6 of the Commissioner of Conservation, also issued pursuant to Act 157 of 1940 and in accordance with the provisions of Order No. 28–C. Order No. 28–C–6, with reference to the production of gas from the Jeter zone of the Logansport Field, provided that, for all purposes of the leases and sublease contracts covering the unit insofar as they affected the production of gas, together with the liquid hydrocarbons contained therein, the lands should be treated, developed, and operated as one lease, one unit, one property, and one tract, and that drilling operations, drilling, and production on any of the tracts included within the unit should constitute drilling operations, drilling, and production under the terms of each and every one of the leases or subleases.

A well producing gas in paying quantities was drilled and completed by the Southern Production Company, Inc., on a tract of land forming a part of the drilling unit in which the tract of land covered by the lease in that case was placed by the orders of the Commissioner of Conservation.

We quote the following from our opinion in that case:

"The defendants contend that there was no violation of their agreement to drill a well on the leased premises during the pri-

mary term of the lease because Orders Nos. 28–C and 28–C–6 prohibited the drilling of more than one well on the unit into which the leased premises was incorporated. Defendants assert that their lease was maintained in full force and effect by virtue of the well which was drilled by the Southern Production Company, Inc., on the unit in question.

"Plaintiffs are not contesting the right of the State to regulate and control, or even to prohibit, the production of minerals. Nor are plaintiffs contesting the right of the State to impair the obligations of contracts under valid police regulations. The lease involved in this case was entered into before the passage of Act No. 157 of 1940 and prior to the issuance of the unitization Orders Nos. 28–C and 28–C–6. Plaintiffs' position, as we appreciate it, is that the Legislature is wholly without right to pass a law affecting contracts entered into before the passage of the law, unless that law is a valid exercise of the police power and makes the performance of the contracts impossible, in which event the contracts are impaired and become null and all the contracting parties are released from their obligations. * * *

"Plaintiffs' argument is not tenable because the defendants in reality have not failed to perform any obligations of their contract. There was no obligation resting upon the defendants to drill a well during the primary term of the lease in the circumstances of this case according to a reasonable interpretation of the contract. If the contract should be annulled, plaintiffs could not drill a well on their 47-acre tract of

land because it forms a part of the 640-acre drilling unit on which a well drilled by the Southern Production Company, Inc., is producing gas in paying quantities. Plaintiffs, as the owners of the leased premises, are entitled to receive the same revenue as they would receive if the well located in the Northeast Quarter of the Northwest Quarter of Section 11 was located on their 47 acres in Fractional Section 10. In other words, if the well of the Southern Production Company, Inc., was located on plaintiffs' 47-acre tract of land in Fractional Section 10, the production would be prorated among all the owners of mineral rights in the drilling unit in the same proportion in which the production is now being distributed. * * *

"The clause in the lease requiring defendants to drill a well on the leased premises within the primary term of five years is not applicable where a well producing gas in paying quantities has been drilled on land within the drilling unit of which the lease land forms a part and where the lessee is prohibited by orders of the Department of Conservation from drilling a well on the leased premises. In other words, the right of defendants to drill a well on the 47-acre tract covered by the lease was in effect taken away from them by the orders of the Commissioner of Conservation, with, however, the right reserved to them, as well as to the plaintiffs, to share in the production of the gas produced from the unit in proportion to their ownership. * * *"

See also Hood v. Southern Production Co., Inc., et al., 206 La. 642, 19 So.2d 336.

In the case here under consideration, the "D" sand area and the Bodcaw sand area in the Cotton Valley Field of Webster Parish, Louisiana, under the provisions of Order No. 10–C, were ordered treated as one lease, one property, and one tract, and all oil, gas, and other hydrocarbons within said area were unitized, and the lands, royalties, and lease interests contained therein were pooled and communized. This order also provided that all gas produced therefrom in excess of the market demand should be returned by recycling operations to the formation from which produced, and the Cotton Valley Operators Committee was designated as the operator of such unitized and pooled areas.

So, if the lease should be annulled, plaintiffs could not themselves drill a well on the land described in the lease because it constitutes a part of the unitized area of the Cotton Valley Field, in which numerous producing wells have long since been completed and are still producing in paying quantities, since the order makes the Cotton Valley Operators Committee the operator of the unitized and pooled areas.

And further, plaintiffs as the owners of the leased premises are entitled to receive the same proportionate share of the revenues from producing wells on any lands in the unitized area as they would receive if a well producing in paying quantities were drilled upon the property covered by the lease. In other words, if a well were drilled on their tract of land, the production would be prorated among all the owners of mineral rights in the drilling unit in the same pro-

portion in which the production is now being distributed.

Plaintiffs in brief concede that on the date of the execution of the lease contract "it was executed and made subject to the implied condition that its fulfillment might be frustrated by a proper exercise of the police power, but in order for such to have this effect, the exercise of the power must be for an end which is in fact public and the means adopted must be reasonably adopted [adapted] to that end", and further argue that "The property of one person may not be taken for the benefit of another private person without justifying public purpose, even though compensation be paid." In support of these two general propositions of law they cite the cases of State of Indiana ex rel. Anderson v. Brand, Trustee, 303 U.S. 95, 58 S.Ct. 443, 82 L.Ed 685, 113 A.L.R. 1482, and Thompson v. Consolidated Gas Utilities Corporation et al., 300 U.S. 55, 57 S.Ct. 364, 81 L.Ed. 510.

We concede that the cited cases are authority for the two general propositions of law, as stated in plaintiffs' brief, but think that they are not applicable to the facts of the case here under consideration; for, as we understand plaintiffs' contention, it is that the exercise by the State of Louisiana, under the facts of this case, of its police power was not for a public purpose but instead related only to parties to private contracts, or that Order No. 10–C was not an exercise of the State's police power for a public purpose.

Article VI, Section 1, of the Constitution of the State of Louisiana reads in part as follows:

"The natural resources of the State shall be protected, conserved and replenished; and for that purpose shall be placed under a Department of Conservation, which is hereby created and established. * * * The Legislature shall enact all laws necessary to protect, conserve and replenish the natural resources of the State, and to prohibit and prevent the waste or any wasteful use thereof."

Pursuant to this mandate of the Constitution, which recognizes the public interest in oil and gas as they are natural resources of this State, and also recognizes the requirement of a sound public policy with reference to the conservation and production of these commodities, the Legislature of this State adopted Act 157 of 1940, which act has for its purpose conservation of the oil and gas resources of this State and the prevention of waste and depletion thereof, and placed in the Commissioner of Conservation the duty and authority to carry out the provisions of the statute.

In this case, the Commissioner of Conservation, acting under the authority of the act, issued Order No. 10–C, which, according to its own provisions, has for its purpose the prevention of waste, of the drilling of unnecessary wells, and of excessive loss of reservoir energy, and the replenishment of the natural resources of this State by recycling and other operations in the "D" and Bodcaw sand areas of the Cotton Valley Field. It is admitted in the agreed statement of facts that, since the pressure maintenance plant and system have been established and the plant put in opera-

tion, the royalties to all parties in said unitized area have been increased, including those royalties from wells which were producing prior to the effective date of said order—a fact which indicates to us that the order is accomplishing its purpose.

Moreover, we think that this contention has been fully answered by the case of Hunter Co., Inc., et al. v. McHugh, 202 La. 97, 11 So.2d 495, and the authorities therein cited, especially Ohio Oil Co. v. Indiana, 177 U.S. 190, 20 S.Ct. 576, 44 L.Ed. 729, and Lilly v. Conservation Commissioner of Louisiana, D.C., 29 F.Supp. 892.

For the first time in this court, plaintiffs contend that the Commissioner of Conservation in issuing Order No. 10–C exceeded the authority granted to him by law and particularly by Act 157 of 1940. Further, they urge for the first time here that the lease executed by Thomas Crichton, Jr., Trustee, and P. F. Childs covered all minerals under said land and was not limited to any one formation or to any two formations, and they contend that, this being so, the order, which was limited to two sands, could not hold the lease as to all other formations.

Neither one of these issues was urged in the court below or raised by the pleadings, and therefore they are not properly before this court and cannot be considered on appeal. Gilly v. Roumieu, 11 La.Ann. 746; DeGrilleau et al. v. Boehm, 106 La. 472, 31 So. 74; Cunningham v. Penn Bridge Co., 131 La. 196, 59 So. 119; Quaker Realty Co., Ltd., v. Maier-Watt Realty Co., 134 La. 1030, 64 So. 897; Woodward, Wight & Co., Ltd., v. National Box Co., Inc., 168 La. 701, 123 So. 296; Succession of Quinn, 183 La. 727, 164 So. 781; Gaines v. Crichton, 187 La. 345, 174 So. 666; State v. Great Atlantic & Pacific Tea Co., 190 La. 925, 183 So. 219.

For the reasons assigned, the judgment appealed from is affirmed, plaintiffs-appellants to pay all costs.